UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
        :
**CHARLOTTE HLAVAC-MAASS**,        :
        :
        Plaintiff,        :  **MEMORANDUM DECISION AND**
        :  **ORDER**
   – against –        :
        :  23-CV-01586 (AMD)
        :
**KILOLO KIJAKAZI, ACTING**
**COMMISSIONER OF SOCIAL SECURITY**,    :
        :
        Defendant.        :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

      The plaintiff commenced this action against the defendant, the Commissioner of Social Security (the "Commissioner"), challenging the Commissioner's decision denying the plaintiff disability insurance benefits under the Social Security Act.

      Before the Court is (1) the plaintiff's motion for judgment on the pleadings, requesting that the Court reverse the Commissioner's decision and remand the matter for further proceedings; and (2) the Commissioner's cross-motion judgment on the pleadings, requesting that the Court affirm the Commissioner's decision denying benefits and dismiss this action. For the reasons explained below, the Court grants the plaintiff's motion, denies the defendant's cross-motion, and remands the case for further proceedings.

## BACKGROUND

      The plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") on November 21, 2019. (Administrative Transcript ("Tr.") 13, 80, ECF No. 8.) She alleged a disability caused by a learning disability, hypothyroidism, anxiety, a seizure disorder, and possible autism beginning on January 1, 2012. (Tr. 13, 82–83.) The Social

Security Administration ("SSA") denied her claim on March 2, 2020, and denied her request for reconsideration on July 3, 2020.  (Tr. 13.)  The plaintiff requested a hearing before an administrative law judge ("ALJ"), and ALJ Andrew Weiss held a telephonic hearing on October 5, 2021, at which the plaintiff and a vocational expert ("VE") testified.  (Tr. 13, 32–58, 133–34.)  In a November 8, 2021, opinion, ALJ Weiss found that the plaintiff was not disabled for purposes of the Social Security Act.  (Tr. 13–25.)  The Appeals Council denied the plaintiff's appeal on January 4, 2023.  (Tr. 1–6.)

### I. Benefits Assessment Under the Social Security Act

A person is considered disabled for purposes of the Social Security Act if she cannot engage in substantial gainful activity due to a physical or mental impairment that has lasted or is expected to last for no less than twelve months.  42 U.S.C. § 423(d)(1)(A).  That means that to qualify for benefits under the Act, a claimant must be unable to do her previous work or any other kind of work.  *Dousewicz v. Harris*, 646 F.2d 771, 772 (2d Cir. 1981).

An ALJ uses a five-step sequential evaluation process to decide whether a claimant satisfies this standard.  The first step is to determine whether the claimant is currently engaged in any substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is not, the ALJ must next determine whether the claimant has a "severe . . . impairment" that significantly limits her ability to do basic work activities.  *Id.* § 404.1520(a)(4)(ii).  If the claimant has a severe impairment, the ALJ must then decide whether the impairment is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If it is, the ALJ will presume that the claimant is disabled.  *Id.* § 404.1520(a)(4)(iii).  If the impairment is not listed, the ALJ must assess the claimant's residual functional capacity ("RFC"), which is her ability to work on a sustained basis despite the impairments.  *Id.* § 404.1520(a)(4)(iv).  At step four, the ALJ must determine whether the

2

claimant has the RFC to perform her past work.  *Id.*  Finally, if the claimant cannot perform the prior work, the ALJ must assess whether she can do another job.  *Id.* § 404.1520(a)(4)(v).

"The claimant has the general burden of proving that . . . she has a disability within the meaning of the Act, and bears the burden of proving . . . her case at steps one through four . . . ."  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (cleaned up).  At the last step, however, "the burden shifts to the Commissioner to show there is other work that the claimant can perform."  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (cleaned up).

**II.    The Record Before the ALJ**

The ALJ reviewed notes and assessments from the plaintiff's two treating mental health professionals, neurologist, and primary care provider.  The ALJ also reviewed three medical opinions from non-treating doctors and heard testimony from the plaintiff and a vocational expert.

    **a.    Notes and Assessments from Treating Providers**

        *i.    Licensed Social Worker Lauren Greenwald Froitzheim*

Licensed Social Worker Lauren Greenwald Froitzheim treated the plaintiff for anxiety beginning on April 14, 2017, on a weekly or bi-monthly basis.  (Tr. 499, 485–90.)  Greenwald Froitzheim's notes reflect that the plaintiff lived with her husband and sold wine, took dance classes, went to church, sang in a choir, attended concerts, went out for dinner, and cared for a child.  (Tr. 486–90.)  However, the plaintiff's anxiety got worse after a series of events beginning in November 2019, when her husband was in a serious car accident.  (Tr. 490, 499.)  In December 2019, the plaintiff was evicted from her apartment and became homeless.  (Tr. 490.)  She also was hospitalized because of a seizure and had to see a neurologist.  (Tr. 499.)

In a February 3, 2020 letter, submitted in connection with the plaintiff's DIB and SSI claims, Greenwald Froitzheim wrote that the plaintiff had anxiety, epilepsy, a learning disorder,

3

and delayed speech. (*Id.*) She also explained that the plaintiff was homeless, could not find "a meaningful job," and had difficulty getting around Long Island without a car. (*Id.*) Nevertheless, the plaintiff took pride in her part-time work, maintained a strong faith, and regularly attended church. (*Id.*) Greenwald Frotzheim explained that the plaintiff had suicidal ideations in the past but was not experiencing those thoughts as of February 3, 2020. (*Id.*)

According to Greenwald Froitzheim's notes from sessions between 2019 and 2020, the plaintiff did chores, updated her resume, sold wine, read books, saw friends, decorated for the holidays, and "tried to remain upbeat." (Tr. 940–42.) Session notes from March 2020 reflect that the plaintiff went to the emergency room for depression on March 10, 2020. (Tr. 974.) Following that visit, the plaintiff's neurologist changed the plaintiff's seizure medication from Depakote to Klonopin. (*Id.*).

Notes from 2021 sessions show that the plaintiff saw friends and tried to expand her wine business, but also struggled with anxiety, and had a "melt down" because she was late to the doctor. (Tr. 937–38.) She also had bloodwork done for hyperthyroidism. (*Id.*) She was also selling Pampered Chef products, was planning a Pampered Chef party, and did her own taxes. (Tr. 924, 937.)

Greenwald Froitzheim completed an evaluation of the plaintiff on May 4, 2021. (Tr. 507–10.) In addition to anxiety, epilepsy, and learning difficulty, Greenwald Frotzheim diagnosed the plaintiff with autism as part of the "treating diagnoses." (Tr. 508.) She described the plaintiff's symptoms as "very stressed, on med[ication] for epilepsy, anxiety due to" her recent autism diagnosis. (*Id.*) The plaintiff was also in individual and couples' therapy. (*Id.*) The plaintiff was of average intelligence but was "sometimes slow to grasp ideas or perception" and her attention could wander; she was "in and out of focus." (*Id.*) In addition, the plaintiff had

4

"sensory issues" with loud sounds and certain textures and touch, her mood could be very anxious, and she struggled to adapt to sudden changes. (Tr. 508–09.) The plaintiff also tended to think that others were talking about her and took things personally. (*Id.*)

Despite her challenges, the plaintiff maintained a "positive attitude" and "good behavior." (Tr. 508.) She was well-groomed and showered every day, took public transit, and shopped. (Tr. 508–09.) The plaintiff's ability to do "work-related mental activities" was limited because of her learning difficulty, memory, epilepsy, and autism. (Tr. 509.) Anyone who supervised the plaintiff would have to be "understanding" about her limitations. (*Id.*) The plaintiff's "abilities to socialize and adapt" were limited. (*Id.*)

      *ii.*    *Psychologist Jessica Scher Lisa*

On April 9, 2020, Jessica Scher Lisa, PsyD, evaluated the plaintiff for intellectual disabilities and autism spectrum disorder. (Tr. 757.) Dr. Lisa did a clinical interview and an autism diagnostic interview and completed a "self-reported and a caregiver-reported social responsiveness scale form," a "Wechsler Adult Scale of Intelligence," and "Vineland Adaptive Behavior Scales comprehensive interview form." (*Id.*) The evaluation includes the plaintiff's developmental history, which reflects that she had developmental and learning delays since she was two years old. (*Id.*) At the time of the evaluation, the plaintiff was living in a shelter while her husband was in an assisted living facility recovering from the car accident. (Tr. 758.)

Dr. Lisa wrote in her notes that the plaintiff had difficulty maintaining a job and managing her finances, and was concerned about her lack of housing, inability to live without assistance with daily tasks and financial management, and difficulty maintaining employment. (*Id.*) The plaintiff's other challenges included rigid behaviors, dependency on others, lack of understanding of social nuances, perseverative interests and thought patterns, repetitive and

5

compulsive behaviors, anxiety, becoming overwhelmed easily, social awkwardness, sensory issues, and general social impairments.  (*Id.*)

Dr. Lisa also noted that the plaintiff's speech was sometimes slow with an odd rhythm, she provided exact dates for almost all events, she had subtly inconsistent eye contact, her gestures and facial expressions were sometimes poorly coordinated with her gaze, and she could sometimes dominate and perseverate in conversation.  (Tr. 759.)  The plaintiff also had symptoms of mild anxiety.  (*Id.*)  Overall, the plaintiff "appeared to work to the best of her abilities and was both pleasant and enjoyable to work with."  (*Id.*)

Dr. Lisa's notes included the results of an Autism Diagnostic Interview, which involved questioning the plaintiff's close friend and neighbor; the Interview showed that the plaintiff exceeded the diagnostic cutoff in three out of four categories.  (Tr. 760.)  Dr. Lisa noted that meeting "three out of four significant categories" on the interview "in conjunction with suggestive history and presentation can be considered adequate for meeting the criteria for" an autism diagnosis.  (*Id.*)

Dr. Lisa also noted the results of the Vineland Adaptive Behavior Scales, which measures a person's personal and social skills from birth through adulthood.  (Tr. 761.)  The plaintiff's overall score was low, in the second percentile for adults her age.  (Tr. 762.)  She also had low scores in communication and daily living, below the first percentile for adults her age.  (*Id.*)  The plaintiff scored in the 61st percentile for socialization, which was within the adequate range for her age.  (*Id.*)  Dr. Lisa noted in the evaluation of the Vineland results that the plaintiff could describe the basic parts of a movie plot, complete forms, do laundry and maintain daily hygiene, and count the correct change after a purchase.  (*Id.*)  The plaintiff could not understand sarcasm,

6

give complex directions, complete forms without assistance, clean the bathroom, or use a bank account responsibly. (*Id.*)

The Wechsler Adult Scale of Intelligence results showed that the plaintiff had average verbal communication and below average perceptual reasoning. (Tr. 763.) Her working memory was "extremely low," and her "processing speed" and "full-scale IQ" were "borderline." (*Id.*)

Finally, the plaintiff's score on the Social Responsiveness Scale, which is "a highly regarded autism assessment," was 61, which is in the moderate range. (Tr. 765.) This range is associated with significant symptoms of autism spectrum disorder. (*Id.*) The plaintiff's friend and neighbor also completed a Social Responsiveness Scale about the plaintiff and scored her as a 70, also within the moderate range. (Tr. 766.)

Dr. Lisa concluded that the plaintiff appeared to have met the criteria for an autism spectrum disorder diagnosis. (Tr. 767.) The plaintiff required substantial support in the domains of social communication, restricted-repetitive behaviors, and language impairment. (*Id.*) The plaintiff's ultimate diagnosis was Autism Spectrum Disorder, Level 2, an unspecified anxiety disorder, borderline intellectual functioning, and a learning disability. (Tr. 768.)

Dr. Lisa noted that the plaintiff had a "strong ability" to communicate her needs and thoughts despite her limitations. (Tr. 767.) She also had some positive pro-social skills, a polite manner, and was motivated to become more independent with help, which suggests that, with appropriate interventions, the plaintiff could make progress. (*Id.*) Dr. Lisa noted that the plaintiff would benefit from services offered by the New York State Office for Persons with Developmental Disabilities, including assistance with independent living and financial support and job coaching. (Tr. 768.) Dr. Lisa also recommended cognitive behavior management

therapy and/or medication for the plaintiff's anxiety. (*Id.*) Finally, she gave the plaintiff information about autism support groups. (*Id.*)

        *iii.*    Dr. Andrea Pollack

On January 20, 2020, internist Andrea Pollack, DO, examined the plaintiff. (Tr. 496.) The plaintiff had a seizure earlier that week when she ran out of medication. (*Id.*) The plaintiff said that she saw a neurologist. (*Id.*) Dr. Pollack noted the plaintiff's "aura consist[ed] of anxious and pacing." (*Id.*) In the examination report, Dr. Pollack noted that the plaintiff did not appear to be in acute distress, although she was "tremulous and anxious" during the exam. (Tr. 497.) According to the plaintiff, her daily living activities included cooking, cleaning, doing laundry, shopping, showering, dressing, watching TV, listening to the radio, reading, walking, exercising, and enjoying dance. (Tr. 496.) Dr. Pollack noted that the plaintiff was restricted in activities requiring fine visual acuity bilaterally and recommended that she avoid heights, operating heavy machinery, engaging in activity requiring heavy exertion or which may put her at risk of fall or injury. (Tr. 498.)

        *iv.*    Dr. Aurene Alcasabas

On February 4, 2020, Aurene Alcasabas, MD, the plaintiff's primary care doctor, examined the plaintiff, and noted that she was alert, conscious, oriented, and not in acute distress. (Tr. 500.) The plaintiff answered questions appropriately, her mood and affect were normal, her speech was fluent, and she was not experiencing delusions, illusions, or hallucinations. (*Id.*) Dr. Alcasabas prescribed Xanax as needed for anxiety, for two weeks until she saw her psychiatrist. (Tr. 501.)

### v.     Dr. Aradia Fu

On February 10, 2020, Aradia Fu, MC, the plaintiff's neurologist, evaluated the plaintiff for epilepsy. (Tr. 502.) Dr. Fu noted that the plaintiff's "active problems" were anxiety, epilepsy, and hypothyroidism, and a history of mild intellectual disability. (Tr. 502–03, 505.) The plaintiff told Dr. Fu that she had recently experienced "a lot of stress" because her husband was in the hospital and she had recently been evicted. (Tr. 502.) Her "affect" was normal, she was not distressed, and she was "alert and oriented to person, place, time, and situation." (Tr. 504.) The plaintiff's language was "clear and fluent," and she had "intact comprehension, repetition, naming, and reading." (*Id.*) Dr. Fu prescribed an epilepsy medication that would not worsen her anxiety and admitted the plaintiff to an Epilepsy Monitoring Unit to classify her epilepsy type. (Tr. 505.)

The plaintiff called Dr. Fu on March 13, 2020 because she was depressed with suicidal ideation. (Tr. 544.) On April 10, 2020, Dr. Fu changed the plaintiff's medication, although the plaintiff said she thought, in hindsight, that her epilepsy medication did not cause the depression and suicidal ideation. (*Id.*) According to notes from follow-up visits on September 1 and October 1, 2020, the plaintiff was doing well on her new medication. (Tr. 965, 969.)

On January 4, 2021, Dr. Fu noted that the plaintiff was living in a hotel in Queens with her husband and looking for housing. (Tr. 958.) She was not distressed and was doing well on her epilepsy medicine. (Tr. 960–61.) On May 26, 2021, Dr. Fu noted that the plaintiff showed no impairment in understanding and carrying out instructions, making judgments, or maintaining socially appropriate behavior. (Tr. 780.)

### vi.     Dr. Roy Chen

According to Dr. Roy Chen, the plaintiff's hematologist/oncologist, the plaintiff had no limitations and was not disabled. (Tr. 22.)

b. **Consultative Opinions**

   i. *Dr. Paul Herman*

Dr. Paul Herman did a consultative examination of the plaintiff on January 20, 2020. (Tr. 491.) He diagnosed the plaintiff with an unspecified learning disability and a mild, chronic, unspecified adjustment disorder with anxiety. (Tr. 493.) Her impairments were not severe enough to keep her from enrolling in vocational training. (*Id.*) Her prognosis was "fair," although "problematic," because she was homeless and her husband was hospitalized. (*Id.*) The evaluation recommended psychotherapy, medical follow-up, vocational training, and vocational placement. (*Id.*).

According to Dr. Herman, the plaintiff's recent and remote memory, as well as her cognitive skills, were "intact;" the plaintiff could recall objects after some delay and repeat six digits forward and three backward. (Tr. 492.) However, her intellectual functioning was in the low average range. (*Id.*) Her insight and judgment had "some limited consistency." (*Id.*)

Dr. Herman believed that the plaintiff was suitable for employment. (*Id.*) There appeared to "be no evidence of limitation with respect to [the plaintiff's] ability to understand, remember, and apply simple directions and instructions, use reason and judgment to make simple work related decisions, sustain concentration, consistent pace, ordinary routine, regular attendance, maintain well being, personal hygiene, appropriate attire, be aware of hazards and take appropriate precautions, interact adequately and regulate emotions in a work setting." (Tr. 493.) Dr. Herman opined that the plaintiff had psychiatric problems; without more, these problems did not seem significant enough to interfere with the plaintiff's ability to function in a job. (*Id.*)

10

### ii. Dr. D. Brown

D. Brown, PsyD, appears to have reviewed some of the plaintiff's medical records but did not personally examine her. (Tr. 64–65.) Dr. Brown found that the plaintiff's impairments, anxiety and neurodevelopmental disorders, were medically determinable, but did not "precisely" satisfy the diagnostic criteria. (Tr. 64.) The plaintiff's primary impairment was epilepsy, which was listed as severe. (*Id*.) The plaintiff's anxiety impairments were listed as secondary and non-severe. (Tr. 64–65.)

### iii. Dr. L. Haus

L. Haus, PsyD, appears to have reviewed some of the plaintiff's medical records but did not personally examine her. (Tr. 88–89.) Dr. Haus also listed the plaintiff's epilepsy as severe and her anxiety impairments as non-severe. (*Id*.)

### iv. Drs. B. Patel and A. Vinluan

On February 20, 2020, Dr. B. Patel submitted a Residual Functional Capacity ("RFC") form. (Tr. 67–68.) According to Dr. Patel, the plaintiff did not have physical or communicative limitations, but she did have environmental limitations. (Tr. 67.) In the RFC form, he reported that the plaintiff should avoid concentrated exposure to vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. (*Id*.) Dr. A. Vinluan, MD, affirmed Dr. Patel's RFC conclusion on July 20, 2020. (Tr. 93.)

**c.    Plaintiff's Hearing Testimony**

At the October 5 hearing before ALJ Weiss, the plaintiff testified that she did "side work" for OneHope, a company that did wine tastings in people's homes and virtually, but did not make a significant amount of money from this work. (Tr. 38.) The plaintiff started working with OneHope in 2019 and made commission of $25 to $50 dollars per tasting, but she had never made more than $1,000 in a month. (*Id*.) The plaintiff testified that the most she made was

11

about $150 in a tasting. (Tr. 48.) The plaintiff testified that her autism and anxiety prevented her from participating in more tastings and from doing other work. (Tr. 39.)

The plaintiff was "open" to getting a full-time job, "depending on the management." (Tr. 41.) She had negative experiences in the past when management did not listen to her; for example, when she worked at Chuck E. Cheese, her supervisor did not give her the gloves she requested to clean with. (Tr. 40–41.) The plaintiff felt there was a "lack of communication" with some managers, and she thought that managers were upset with her. (Tr. 50-51.)

The plaintiff did not drive, but she felt that she could "somewhat" take public transportation by herself, as she was getting accustomed to her new environment in Queens. (Tr. 42.)

As of the hearing date, the plaintiff had not had a seizure since January 2020, and her medication was working well. (Tr. 43.) Her new medication for hypothyroidism made her tired and affected how she felt overall. (Tr. 44–45.) The plaintiff watched TV, joined Zoom meetings with her OneHope coworkers, used Facebook, had a "ton of friends," and was planning her high school reunion. (Tr. 45–46.)

### d. Vocational Expert's Testimony

Vocational expert ("VE") Kenneth Smith also testified at the hearing. (Tr. 52.) The ALJ posed the following hypothetical to the VE.

> Assume a hypothetical individual the same age, the same education, same work experience as the Claimant. Physically, she doesn't have to be -- it's very limited. But assume a hypothetical individual -- this hypothetical claimant. She said she has some problems walking upstairs, but let me just -- she could certainly lift ten pounds occasionally, five pounds frequently, sit for six hours in an eight-hour day, stand and walk for four hours in an eight-hour day. No manipulative limitations. Climbing stairs, she could do frequently. No ladders and scaffolds. No unprotected heights. No moving machinery and no operating of motor vehicle, even though her -- she hasn't had a seizure in a long time. You never know.

12

> And assume that the Claimant is able to perform simple routine tasks. She's able to perform -- make simple routine -- simple work-related decisions. She'd have no problems interacting with supervisors, co-workers, and the public.

(Tr. 52–53.)

The VE testified that available full-time jobs included an addressing clerk, of which there were about 7,000 positions nationally, and a hand packager, of which there were about 10,000 positions nationally. (Tr. 54–55.) The VE testified that there were no part-time jobs available for a similar hypothetical individual who could not work a full week or would have to spend at least 15% of the week off task. (Tr. 55–56.) Spending more than 10 percent of time off task would be unacceptable. (Tr. 57.) This hypothetical individual could be able to obtain employment if she were absent less than twice a month. (*Id.*) But if she continued to be absent once per month consistently for six months or more, the impact of these absences would "accumulate" and "preclude [her] ability to hold on to the job." (*Id.*)

### III. The ALJ's Opinion

The ALJ determined that the plaintiff was not disabled within the meaning of the Act and denied her claim. (Tr. 25.) He concluded that the plaintiff met the insured requirements of the Social Security Act and had not engaged in substantial gainful activity since January 1, 2012, the alleged onset of the plaintiff's disability. (Tr. 15.) The ALJ also found that the plaintiff's epilepsy, adjustment disorder with anxiety, and autism spectrum disorder were severe impairments, but that they were not listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, as they were no more than moderate. (Tr. 16–17.) He ruled that the plaintiff's other impairments—hypothyroidism, anemia, and the unspecified learning disorder—were not severe. (Tr. 16.)

In light of all the facts on the record, the ALJ held that the plaintiff had sufficient residual functional capacity to perform a variety of jobs ranging from sedentary work to light physical

13

activity, and that she was "able to perform simple, routine tasks and . . . to perform simple work-related decisions." (Tr. 17–25.) Citing the VE's testimony, the ALJ concluded there were jobs that exist in significant numbers in the national economy that the plaintiff could perform: an inspector, an addressing clerk, or a hand packager. (Tr. 24–25.)

## LEGAL STANDARD

A district court reviewing the Commissioner's disability decision must determine "whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); 42 U.S.C. § 405(g). "[S]ubstantial evidence" means "more than a mere scintilla;" it is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (cleaned up).

"Although factual findings by the Commissioner are 'binding' when 'supported by substantial evidence,'" the court will not defer to the ALJ's determination "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 188–89 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). Thus, "[e]ven if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Moreover, the district court should remand if "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (citations omitted).

## DISCUSSION

The plaintiff contends that the ALJ's findings at step three and step five were not supported by substantial evidence. The plaintiff argues that in determining the RFC, the ALJ did

14

not give appropriate weight to the opinion of the plaintiff's treating therapist. The plaintiff also challenges the ALJ's finding that the plaintiff could find work in the national economy as not supported by substantial evidence because the ALJ employed a hypothetical that did not include all of the plaintiff's mental limitations. Moreover, the plaintiff claims that the record did not support the ALJ's finding that the plaintiff would not be off-task and absent frequently enough to preclude employment.

I.      **The ALJ's RFC Finding**[1]

The plaintiff contends that the ALJ's mental RFC finding was not supported by substantial evidence because it did not give appropriate weight to the opinion of the plaintiff's treating therapist, Lauren Greenwald-Froitzheim, "whose opinion[] the ALJ found to be 'less persuasive'" than some others in the record. (ECF No. 11 at 15 (quoting Tr. 23).)

The ALJ found that the plaintiff was "able to perform simple, routine tasks and is able to perform simple work-related decisions." (Tr. 18.) As the Commissioner points out, "though the ALJ did not rely heavily on it, Ms. Greenwald-Frotzheim's opinion largely tracks the RFC;" for example, she "indicated by check box that [the plaintiff] was 'limited' as opposed to having 'no limitation,'" and "the ALJ agreed that [the plaintiff] was limited and could perform only unskilled work with simple, routine tasks and simple, work-related decisions." (ECF No. 13-1 at 20 (quoting Tr. 509–10).) Greenwald Frotzheim also noted that the plaintiff needed "a supervisor to be understanding" due to the plaintiff's "learning difficulty, understanding and memory," that the plaintiff would need supervision "due to [her] epilepsy and learning difficult[y]," that she would need flexibility in "scheduling," and that the plaintiff would not do

---

[1] The plaintiff also argues that remand is necessary because the ALJ did not assign specific weight to Dr. Lisa's opinion. Any error is harmless; Dr. Lisa's opinion is largely consistent with the RFC finding. *See Campbell v. Comm'r of Soc. Sec.*, No. 19-CV-03215, 2020 WL 5641200, at *11 (S.D.N.Y. Sept. 22, 2020).

15

well with "sudden changes." (Tr. 509–10.) All of these statements are consistent with the RFC—the unskilled work that the ALJ found the plaintiff could do require only that she remember "very short and simple instructions," with supervisory assistance, where "maintaining a schedule is not critical," and limiting the work to "routine" only. Social Security Program Operations Manual Systems, DI 25020.010.B.3.

Even if the ALJ had assigned Greenwald Frotzheim's opinions more weight, it is not clear that the RFC would be any different. For example, the ALJ relied in part on consultative examiner Dr. Herman, who opined that the plaintiff had "no limitations in her ability to understand, remember, and apply simple directions and instructions, use reason and judgment to make simple work related decisions, sustain concentration, consistent pace, ordinary routine, regular attendance, maintain well being, personal hygiene, appropriate attire, be aware of hazards and take appropriate precautions, interact adequately and regulate emotions in a work setting." (Tr. 20, 22.) The ALJ found that "Dr. Herman's opinion is generally persuasive[;] however, additional limitations to concentrating, persisting and maintaining pace are warranted to accommodate the combined effects of any symptoms related to her anxiety and autism as detailed above." (Tr. 22.) The ALJ's careful analysis reflects that he accorded due weight to the opinions of the plaintiff's treating therapist. Accordingly, the Commissioner's step three finding is affirmed.

## II. The ALJ's Step Five Finding

The plaintiff contends that the ALJ's finding that the plaintiff would be able to find work in the national economy is not supported by substantial evidence because the hypothetical the ALJ posed to the VE did not include all of the plaintiff's mental limitations, and the record did

16

not support the ALJ's finding that the plaintiff would not be off-task and absent frequently enough to preclude employment.[2]

### a. VE Hypothetical

The ALJ did not include any mental limitations in the hypothetical posed to the VE. The ALJ stated only that the hypothetical claimant is "able to perform—make simple routine—simple work-related decisions. She'd have no problems interacting with supervisors, co-workers, and the public." (Tr. 53)

This hypothetical does not include the language the ALJ used in the RFC finding, in which he found that "limitations [on] concentrating, persisting and maintaining pace are warranted to accommodate the combined effects of any symptoms related to her anxiety and autism as detailed above." (Tr. 22.) Thus, the VE's testimony did not have a "sound basis," and thus did not constitute substantial evidence. *Sanchez v. Barnhart,* 329 F. Supp. 2d 445,449 (S.D.N.Y. 2004); *see also Day v. Astrue*, No. 09-CV-131, 2011 WL 1467652, at *16 (E.D.N.Y. Apr. 18, 2011) ("The ALJ must pose hypothetical questions [that] reflect the full extent of the claimant's capabilities and impairments.'"); *Stellmaszyk v. Berryhill*, No. 16-CV-9609, 2018 WL 4997515, at *28 (S.D.N.Y. Sept. 28, 2018). *Compare Mendoza v. Astrue*, No. 06-CV-1233, 2008 WL 5054243, at *14 (N.D.N.Y. Nov. 20, 2008) ("Undeniably, the first hypothetical posed to the vocational expert did not comport with the ALJ's RFC determination, since it assumed plaintiff's ability to lift and carry twenty pounds occasionally, whereas the ALJ's own RFC determination limited plaintiff's lifting ability to ten pounds. The second hypothetical offered to the expert, however, incorporated the ALJ's RFC determination, including all of the mental restrictions indicated in his findings."). Accordingly, remand is required.

---

[2] The Commissioner did not address either of these arguments.

On remand, the ALJ should include VE testimony based on a hypothetical that incorporates the mental limitations from the plaintiff's RFC.

**b.      The Plaintiff's Time Off-Task and Frequency of Absences**

The plaintiff argues that the ALJ did not consider the extent to which she would be off-task and absent from work, and whether it would keep her from working.  According to the VE, someone who spends more than 10 percent of her time off-task could not keep employment in any of the jobs the VE identified.  (Tr. 57.)  The VE testified that someone who was absent once a month for six to nine months would not be able to hold on to a job.  (*Id.*)

Because the ALJ did not address these issues, there was not substantial evidence to support his step five conclusion.  As explained above, the ALJ stated as part of the RFC finding that the plaintiff had "limitations to concentrating, persisting and maintaining pace."  (Tr. 22.)  The hypothetical to the VE did not incorporate these limits.  Based on the VE's testimony, which did not include the plaintiff's mental limitations, the ALJ found at step five that the plaintiff could find employment in the national economy and did not address whether the plaintiff would be absent from work or off-task 10% or less of the time.

It is not clear from the record whether the plaintiff's limitations in concentrating, persisting, and maintaining pace (Tr. 22) mean that she would be "off-task" 10 percent of the time.  Accordingly, remand is necessary to develop the record.  "Nor is the ALJ's error in this respect harmless: the vocational expert testified that 10% or more time off-task would render plaintiff unemployable, and direct a finding of disability.  Thus, whether plaintiff would be off-task for 10% or more, or less than 10%, of the workday, could dictate the outcome of the ALJ's decision."  *John C. v. Kijakazi,* No. 23-CV-6145, 2023 WL 8644129, at *2 (W.D.N.Y. Dec. 14, 2023); *see also Devers v. Comm'r of Soc. Sec.*, No. 21-CV-5931, 2023 WL 2734431, at *6 (S.D.N.Y. March 31, 2023) (ALJ erred in failing to consider or address how many absences the

plaintiff would have per month and how often the plaintiff would be off task); *Guzman v. Comm'r of Soc. Sec.*, No. 20-CV-7420, 2022 WL 2325908, at *10 (S.D.N.Y. June 10, 2022) ("[T]he ALJ's failure to address the issue of how much time Plaintiff would miss in a month based on his ailments, and the VE's testimony that only one absence a month would be tolerated, was legal error."); *Faure v. Comm'r of Soc. Sec.,* No. 22-CV-1571, 2023 WL 5013282, at *14 (S.D.N.Y. Aug. 7, 2023) ("[A]t the hearing, the VE opined that someone who was off task more than 10% of the time or was moderately limited in interacting with others would not be able to work, but the ALJ never reconciled whether the various moderate limitations that the medical source opinions found constituted a likelihood that she would be off task more than 10% of the time.  Therefore, remand is warranted." (citation omitted)).

Remand is appropriate to give the ALJ the opportunity to consider whether the plaintiff's mental limitations would affect her ability to hold a job.

## CONCLUSION

For these reasons, I grant the plaintiff's motion, deny the Commissioner's cross-motion, and remand the case for further proceedings.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       March 6, 2024